IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| United States of America, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action Number |
| | ) | 14-00124-01-CR-W-SRB |
| Henry Thomas Hammond, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Pending before the Court is the MOTION TO SUPPRESS STATEMENTS (Doc. #21) filed on April 10, 2015, by defendant Henry Thomas Hammond ("Hammond"). On September 3, 2015, the undersigned held an evidentiary hearing on Hammond's motion. Hammond was present and was represented by his counsel, Charles Lembcke and Luke Baumstark. The government was represented by Assistant United States Attorney Jane Brown. At the evidentiary hearing, five witnesses testified: Hammond, his wife (Nancy Hammond), and Special Agents Todd Gaines, Thomas Jackson and Katie Laidacker, all with the Kansas City Division of the FBI. Additionally, the following exhibits were admitted into evidence:

| Number | Description |
| --- | --- |
| Gov't. #1 | 302 [08/16/2011] |
| Gov't. #2 | FBI letter [08/16/2011] |
| Gov't. #3 | 302 [04/04/2012] |
| Gov't. #4 | 302 [01/07/2013] |
| Gov't. #5 | 302 [01/07/2013] |
| Gov't. #7 | 302 [01/29/2013] |
| Gov't. #8 | Notes [Gaines] |
| Gov't. #9 | Notes [Jackson] |
| Def't. #`3 | E-mail chain |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

# PROPOSED FINDINGS OF FACT[1]

1.	Todd Gaines and Thomas Jackson are Special Agents with the Kansas City Division of the FBI.  Tr. at 6, 47.

2.	In May or June of 2012, Agent Gaines began working as the new case agent on an FBI investigation involving Thomas Hammond.  Tr. at 7, 18.

3.	On January 7, 2013, Agent Gaines contacted Hammond by telephone to schedule an interview[2] with Hammond.  Tr. at 11, 90, Gov't #4; Gov't #5.

4.	Agent Gaines told Hammond that they were looking for assistance in getting "some bad guys who had been involved in investment fraud" and thought that Hammond may be able to help "sort things out."  Tr. at 15, 90.

5.	For at least a year prior to Agent Gaines' call to Hammond, the FBI had been conducting interviews of individuals (including some friends of Hammond) aimed at incriminating Hammond.  Tr. at 15-16.

6.	After agreeing to talk to Agent Gaines, Hammond spoke to an attorney (Tom McGiffin) "about whether [he] should meet with the FBI."  Tr. at 116.

7.	Mr. McGiffin offered to allow Hammond to use his office for the FBI meeting, but Hammond declined the offer.  Tr. at 120.

---

[1]	In making these findings, the Court has been required to make some credibility determinations, particularly as they pertain to the officers' recitation of the facts surrounding the interview and the testimony of Mr. and Mrs. Hammond regarding the interview.  By in large, the discrepancies were trivial and/or irrelevant to the legal issue before the Court.  However, there was one major exception: Hammond's testimony that, in the middle of the interview, he specifically requested an attorney, but, after the agents continued questioning him, he proceeded to answer questions.  The agents deny that this discussion occurred.  In the end, the Court concludes that the agents' testimony is more credible than Hammond's testimony on this issue (Mrs. Hammond was not present when the alleged invocation of counsel was made).  In making such a determination (and in evaluating the overall credibility of the witnesses), the Court considered (1) the demeanor of the witnesses on the stand, (2) the interest the witnesses had in the outcome of the motion, and (3) the opportunity of the witnesses to hear, observe, and recall what was said or done.

[2]	Prior to Special Agent Gaines' involvement in the Hammond investigation, two other FBI agents (Special Agent Angela Frisbie and Special Agent Kacie Laidacker) had interviewed Hammond in August of 2011.  Tr. at 7.  In addition, by September of 2013, Hammond was cooperating and assisting law enforcement agencies in several jurisdictions investigating potential fraud.  Tr. at 99.  In some of those investigations, Hammond was considered a victim.  Tr. at 100.

2

Case 4:14-cr-00124-SRB   Document 60   Filed 12/02/15   Page 2 of 12

8. As per the arrangements made between Agent Gaines and Hammond, on January 25, 2013, Agents Gaines and Jackson went to Hammonds' residence to conduct an interview. Tr. at 12-13, 15, 47.

9. Agents Gaines and Jackson arrived at Hammond's residence at 9:00 a.m. and Hammond led the agents to his dining room. Tr. at 13, 26, 29, 83, 90, 100, 102.

10. Hammond's wife (Nancy) was present when the agents first arrived at the house and was introduced to the agents. Tr. at 82.

11. When the agents arrived, Mrs. Hammond commented to her husband "Now, you're sure you don't need to have an attorney with you?" Tr. at 83, 101.

12. Mrs. Hammond stated that she and her husband had discussed the matter earlier. Tr. at 83, 86-87.

13. Hammond responded to his wife "No, honey," and told her that he was "happy to do whatever he could to cooperate." Tr. at 83.

14. Agents Gaines and Jackson sat on one side of the dining room table while Hammond sat on the opposite side of the table (Mrs. Hammond did not remain in the room for the interview). Tr. at 26.

15. At the beginning of the interview, Agent Gaines informed Hammond that the interview was voluntary. Tr. at 14, 19, 39-40.

16. The agents told Hammond that the case was in the preliminary stages of investigation and Hammond stated that he wanted to meet with the agents and "explain everything." Tr. at 24, 32.

17. On at least two occasions during the interview, Hammond left the dining room unaccompanied to retrieve documents from elsewhere in his house. Tr. at 27, 39, 58, 64.

18. Early in the interview, Hammond stated that he had an attorney and that he had spoken with the attorney regarding aspects of the litigation matters being discussed with the agents. Tr. at 24, 30, 39-40, 49-50, 61.

19. Hammond commented that his attorney would probably be "mad" at him for talking to the agents and, in fact, his attorney had advised him not to talk to the agents. Tr. at 19, 24, 33, 49-50, 61-62.

20. At no point during the interview did Hammond tell the agents he needed an attorney or request to have an attorney present. Tr. at 18-19, 33, 49, 51, 60-61, 67.

21. At no point during the interview did either of the FBI agents tell Hammond that he did not need an attorney. Tr. at 20.

3

22. At one point during the interview, Hammond became "emotional" and began to "tear up a little bit" and Agent Gaines told Hammond it was up to him as to whether he wanted to continue the interview. Tr. at 51, 56, 57-58, 66.

23. Hammond chose to continue with the interview. Tr. at 51, 58.

24. The interview with the agents lasted approximately seven hours. Tr. at 22.

25. At approximately 1:53 p.m., Agent Jackson had to leave for another matter and the interview continued with just Agent Gaines and Hammond. Tr. at 13, 18, 30, 47-48, 58.

26. Near the conclusion of the interview, Hammond was served with a grand jury subpoena for personal and business records related to his companies. Tr. at 14, 22.

27. Upon receiving the subpoena, Hammond felt he "had been had" and told Agent Gaines that the interview was over. Tr. at 109.

28. At no time during the interview was Hammond read his *Miranda* rights. Tr. at 14, 20, 50.

29. At no time during the interview did either of the FBI agents show their weapons or mention that they had weapons. Tr. at 14, 22, 52.

30. Hammond was not placed under arrest during the interview or at the conclusion of the interview. Tr. at 25.

31. Hammond has a Bachelor's degree in Civil Engineering. Tr. at 110-11.

32. Prior to the January 25, 2013 interview, Hammond had been involved in legal proceedings wherein he had retained counsel. Tr. at 111-12.

## Conclusions of Law

In his motion to suppress, Hammond seeks the suppression of all incriminating statements he made to Agents Gaines and Jackson on January 25, 2013, arguing that the statements were obtained in violation of his constitutional rights. With regard to Hammond's statements to the agents, the Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement
> that the [government] which proposes to convict and punish an
> individual produce the evidence against him by the independent
> labors of its officers, not by the simple, cruel expedient of forcing
> it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462, 101 S.Ct. 1866, 1872 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from
> testifying <u>voluntarily</u> in matters which may incriminate him, . . .
> for those competent and freewilled to do so may give evidence
> against the whole world, themselves included. . . . Indeed, far from
> being prohibited by the Constitution, admissions of guilt by
> wrongdoers, if not coerced, are inherently desirable.

*United States v. Washington*, 431 U.S. 181, 186-87, 97 S.Ct. 1814, 1818 (1977) (*emphasis added*). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. United States*, 530 U.S. 428, 434, 120 S.Ct. 2326, 2331 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435, 120 S.Ct. at 2331; *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 2630 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth
> Amendment privilege against self-incrimination, *Miranda* imposed
> on the police an obligation to follow certain procedures in their
> dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 1140 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70, 86 S.Ct. at 1624-26.

With regard to the January 25, 2013 interview with Agents Gaines and Jackson, it is undisputed that *Miranda* rights were not read to Hammond nor did he waive such rights prior to or during the interview. Nonetheless, the Court concludes that suppression of Hammond's statements is not warranted since the encounter did not rise to the level of custodial interrogation. Specifically, the Court concludes that Hammond was not "in custody."

To that end, the Eighth Circuit has identified six common "indicia of custody" which tend to confirm or refute an atmosphere of custodial interrogation. *United States v. Axsom,* 289 F.3d 496, 500-01 (8th Cir. 2002). The indicia are:

(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2) whether the suspect possessed unrestrained freedom of movement during questioning;

(3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4) whether strong arm tactics or deceptive stratagems were employed during questioning;

(5) whether the atmosphere of the questioning was police dominated; and

(6) whether the suspect was placed under arrest at the termination of the questioning.

6

*Id.* The Court has explained that the first three indicia are "mitigating factors" (*i.e.*, their presence mitigates against the existence of custody at the time of questioning) and the last three indicia are "aggravating factors" (*i.e.*, their presence aggravates the existence of custody). *Id.* However, the Court has emphasized that the six factors "are not exclusive." *Id.*

> A finding of custody does not require the factual circumstances of a case to present all indicia; and a particularly strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

*Id.* Examining the facts of this case, the Court concludes that the indicia simply do not support a finding of custody and, as such, statements made by Hammond to the FBI agents are not subject to suppression under *Miranda* because the *Miranda* rights were not triggered.

Hammond was told that the interview was voluntary. Indeed, at one point in the interview when Hammond became emotional, Agent Gaines specifically asked him if he wished to continue the interview or stop the questioning. Finally, when presented with the grand jury subpoena, Hammond told Agent Gaines that he was terminating the interview; at which point, the interview concluded.

In addition, Hammond was not restrained during the interview and, on at least two occasions, left the room, unaccompanied, to obtain documents from elsewhere in the house. While Agent Gaines initiated the phone call to Hammond to set up the interview, the time and place of the interview was arranged as per the requests and convenience of Hammond.

Although Hammond now contends that he feels duped that he was not informed that he was a target of the agents' investigation, there is no credible evidence that the agents lied to Hammond, made improper promises to Hammond, or otherwise utilized strong-arm tactics to

7

obtain statements from Hammond.³ In addition, while there were two agents present for most of the interview, it appears that Agent Jackson's role was primarily as an observer and occasional note-taker and the interview, for all intents and purposes, was a one-on-one discussion between Agent Gaines and Hammond. Neither agent brandished their weapons at any time. Moreover, the interview took place in Hammond's home, not a police station interrogation room. Finally, Hammond was not placed under arrest at the conclusion of the interview. The Court concludes that Hammond was not in custody and the statements he made to the FBI agents on January 25, 2013 were voluntary.⁴

---

³ Certainly neither of the FBI agents explicitly explained to Hammond that we was a target of a criminal investigation and the agents encouraged Hammond to "help them" to understand the complex financial dealings. But such "tactics" are not improper. *Compare United States v. LeBrun,* 363 F.3d 715, 721 (8th Cir. 2004) ("some degree of coercion is part and parcel of the interrogation process and that the coercive aspects of a police interview are largely irrelevant to the custody determination except where a reasonable person would perceive the coercion as restricting his or her freedom to depart"). Furthermore the Supreme Court has observed that "suspects often believe that they can avoid the laying of charges by demonstrating an assurance of innocence through frank and unassisted answers to questions." *McNeil v. Wisconsin*, 501 U.S. 171, 178, 111 S. Ct. 2204, 2209 (1991).

⁴ Hammond's primary complaint about the interview with the FBI agents is that they believed he was a target of the criminal investigation and they did not dispel his belief that he was merely a cooperating witness. However, the Supreme Court has found:

> Our cases make clear, in no uncertain terms, that any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda.*

*Stansbury v. California*, 511 U.S. 318, 326, 114 S. Ct. 1526, 1530 (1994). More specifically, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *United States v. Martin*, 369 F.3d 1046, 1056-57 (8th Cir. 2004) (*quoting Stansbury*, 511 U.S. at 323, 114 S.Ct. at 1529).

8

In addition to arguing that the entire interview was improper because he was not apprised of his *Miranda* rights, Hammond additionally argues that the questioning of him should have stopped when he invoked his right to counsel. While the Sixth Amendment to the Constitution is the traditional basis for a right to counsel, Hammond's right depends – in this case – on the Fifth Amendment.[5]

In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880 (1981), the Supreme Court adopted a prophylactic rule that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present. *Id*. at 484-85, 101 S.Ct. at 1885. In the event that questioning persists, any ensuing statements obtained are subject to suppression.

> The *Edwards* rule is designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights. It does this by presuming his postassertion statements to be involuntary, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards. This prophylactic rule thus protects a suspect's voluntary choice not to speak outside his lawyer's presence.

*Montejo v. Louisiana*, 556 U.S. 778, 787, 129 S.Ct. 2079, 2085-86 (2009) (*citations omitted*). However, the *Edwards* rule, as a corollary to *Miranda*, only extends to custodial interrogations. *United States v. May*, 2014 WL 6775283, op. at *6 (D. Minn. Dec. 2, 2014).[6]

---

[5] As made clear by the Supreme Court, the Sixth Amendment guarantees defendants "a right to counsel at their postarraignment, custodial interrogations." *Michigan v. Jackson*, 475 U.S. 625, 629, 106 S.Ct. 1404, 1407 (1986) (*emphasis added*).

[6] *See also United States v. Ellison,* 632 F.3d 727, 731 (1st Cir.2010) (noting that even if the defendant "had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation"); *Brosius v. Warden, U.S. Penitentiary, Lewisburg, Pa.,* 278 F.3d 239, 249 (3d Cir.2002) ("*Edwards* applies only where the suspect makes a request for counsel while in custody."); *United States v.. Wyatt,* 179 F.3d 532, 537 (7th Cir.1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody[.]"); *United States v. Bautista,* 145 F.3d 1140, 1147 (10th Cir.1998) ("[I]n order to implicate the *Miranda–Edwards* right to counsel prophylaxis, both a custodial situation and official interrogation are required.").

9

Moreover, the Court finds that Hammond – regardless of his custody status – never invoked a right to counsel. As may be surmised, litigation concerning the application of the *Edwards* rule often turns on the issue of whether a defendant – in fact – has asserted his rights under *Miranda*, including the right to counsel. To that end, in a subsequent case, the Supreme Court refined the *Edwards* rule, holding that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [the *Edwards* rule does] not require the cessation of questioning." *Davis v. United States* 512 U.S. 452, 459, 114 S.Ct. 2350, 2355 (1994) (*emphasis in original*). More specifically, to implicate the *Edwards* rule, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.*[7] Applying these principles, the Court in *Davis* held a suspect's statement "[m]aybe I should talk to a lawyer" was equivocal, and not an invocation of the right to counsel for purposes of *Miranda* and *Edwards*. *Id.* at 462, 114 S.Ct. 2350.

In this case, the Court concludes that the credible evidence does not establish that Hammond made an objectively unequivocal request for an attorney. He and his wife discussed whether he should have an attorney present and Hammond chose to go forward with the interview without legal representation. Furthermore, his statements that his attorney would not approve of his interview with the agents and other statements fall short of the *Davis* requirements.

---

[7] There is no requirement that an officer must ask clarifying questions when a suspect makes an ambiguous statement regarding counsel. *Davis*, 512 U.S. at 461, 114 S.Ct. at 2356.

10

A representative case is *United States v. Havlik*, 710 F.3d 818 (8th Cir. 2013). In *Havlik*, the defendant, after being apprised of his *Miranda* rights, said "I don't have a lawyer, I guess I need to get one, don't I?" and "I guess you better get me a lawyer then." *Id*. at 821-22. The court found both statements failed to implicate the *Edwards* rule. With regard to the latter declaration, the court reasoned:

> The phrase "I guess" is "used to indicate that although one thinks or supposes something, it is without any great conviction or strength of feeling." As a transitive verb, to "guess" means to "estimate or suppose (something) without sufficient information to be sure of being correct." [The defendant's] statement is thus not materially different from the statement "[m]aybe I should talk to a lawyer," which the Supreme Court held ambiguous in *Davis*.

*Id*. at 822 (*citations omitted*). In any event, as explained, "if [Hammond] was not in custody, the ambiguity of his request for counsel was irrelevant because someone not in custody has no constitutional right to counsel." *United States v. Malcolm*, 435 F. App'x 417, 420 (6th Cir. 2011).[8]

In accordance with the foregoing discussion, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** the MOTION TO SUPPRESS STATEMENTS (Doc. #21) filed on April 10, 2015, by defendant Henry Thomas Hammond.

---

[8] In addition, the Court does not find that Hammond's references to legal counsel, in themselves, converted the encounter with the FBI agents into a custodial setting. *Compare United States v. Mikerin*, 2015 WL 2227698, op. at *8 (D. Md. May 7, 2015) (defendant's statements "were not invocations of the right to counsel" and therefore "to the extent that such statements could factor into the analysis of whether [the defendant] was in custody in the first place, they do not establish a custodial interrogation"); *United States v. Freeman*, 2010 WL 4386897, op. at *17 (D. Minn. May 13, 2010) *report and recommendation adopted,* 2010 WL 4386894 (D. Minn. Oct. 28, 2010) ("Nor can we responsibly find that the Defendant's question converted an otherwise noncustodial interrogation into custodial questioning, as there is no evidence that the Agents denied the Defendant access to a lawyer, or in any way suggested that he was not free to seek the assistance of counsel, or to terminate the questioning, at that time, such that his question would impact upon the custodial nature of the interview.").

Counsel are reminded that each has 14 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same.  A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

         */s/ John T. Maughmer*
**John T. Maughmer**
**United States Magistrate Judge**